UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARTIN D. MOSHIER, III,

                                        Plaintiff,

        v.                                                    5:06-CV-748
                                                              (FJS/GJD)
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
_____

GREGORY R. GILBERT, ESQ., for Plaintiff
KRISTINA D. COHN, Special Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the

Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with

General Order 18.

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on July 22, 2003.

(Administrative Transcript ("T."), 15).  The application was denied initially on

October 27, 2003.  (T. 28).  Plaintiff requested a hearing before an Administrative

Law Judge ("ALJ"), and a hearing was held on December 7, 2004 by

videoconference.  (T. 264-98).  At the hearing, plaintiff testified and a vocational

expert testified.  *Id*.  In a decision dated January 18, 2005, the ALJ found that

plaintiff was not disabled.  (T. 15-25).  The ALJ's decision became the final decision

of the Commissioner when the Appeals Council denied plaintiff's request for review

on May 12, 2006.  (T. 4-6).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ erred in failing to give "controlling weight" to the opinion of plaintiff's treating physician, Richard M. Blecha, M.D.  (Plaintiff's Brief, 8).

(2) Substantial evidence does not support the ALJ's finding that plaintiff can perform his past relevant work, and other light work positions.  (Plaintiff's Brief, 11).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.

## FACTS

### A.  Non-Medical Evidence and Testimony

Plaintiff was fifty years old at the time of the ALJ's hearing, and has a tenth grade education.  Plaintiff's past work experience includes work as a bartender, cook, bar manager, and factory worker.  (T. 106, 16).  In addition, plaintiff testified that he attended a Coast Guard training course during 1987, and received a Coast Guard license to pilot charter boats.  (T. 268).  According to plaintiff, the course involved seven lengthy days of study, and then a test in Pennsylvania.  *Id*.  Plaintiff stated that he worked as the captain of charter boats for approximately five years between 1987 and 1992.  He testified that he did not renew this license.  (T. 268).  Plaintiff also testified that he worked as a boat salesman, and also installed "rigging" for boats which included radios and other equipment.  (T. 270-71).  Plaintiff's last

work between 1997 and 2002 was in a factory, manufacturing ice cream containers. (T. 272-73).  According to plaintiff, his hands started to become numb when working on machines at the container factory.  (T. 274).  Plaintiff stopped work on January 17, 2002.  (T. 274).

Plaintiff had carpal tunnel surgery on both wrists between June and August 2002, and although his hands had improved, he stated that he had much less strength in his hands, and experienced numbness in the last three fingers on both hands. (T. 274-75).  Plaintiff also testified that he had problems with both knees, including a torn ligament in his right knee, and problems with his low back and shoulders. (T. 276-78).  Plaintiff stated that he was able to take care of all of his personal needs, but did so much more slowly than before.  Plaintiff wore "slip on" shoes since he had difficulty with shoelaces, buttons, and zippers. (T. 279-80).  Plaintiff showered by sitting on a stool in his shower, using a long brush since it "hurts to bend over." (T. 280).

Plaintiff lives in a small cottage with a basement.  Plaintiff testified that he had difficulty with the stairs to his basement, and proceeded "very slowly" to avoid his knee popping out. (T. 281).  Plaintiff was able to clean his home slowly, but had extreme difficulty bending over, and cleaned the house by "sitting."  (T. 282). Plaintiff was able to cut the grass using a push mower, but that chore required "all day when it should have taken less than thirty minutes."  (T. 282).  Plaintiff got help from his brother, girlfriend, and niece, who assisted him with the yard work, buying groceries, and with transportation. (T. 283).  Plaintiff testified that he did leave his

3

house, and occasionally went to a hunting camp.  He occasionally went fishing and

hunting, but did not walk around in the woods when hunting. (T. 286).  Plaintiff

testified that he was able to lift grocery bags and baskets of laundry, but could not sit

for long periods because of the pain in his lower back, and numbness in his feet.  (T.

287).

Plaintiff stated that when he was at home, he had to change positions

constantly, and could sit only for up to twenty-five minutes.  (T. 287).  Plaintiff

stated that he could not walk for more than fifteen minutes because of his back pain

and his knees.  (T. 288).  Plaintiff stated that he occasionally had "bad days," and if

he exerted himself incorrectly, he might have to lay on the floor in a "flat" position

for several days, getting up only to eat and go to the bathroom.  (T. 288-90).  Plaintiff

was able to use a computer, but had difficulty typing because of his fingers.  He also

experienced difficulty playing his guitar.  At the hearing, a vocational expert testified

about plaintiff's past work, and which jobs were available in the national economy

according to hypothetical questions asked by the ALJ.

**B.  Medical Evidence**

**1.  Mexico Family Health Center - Dr. Thomas Hanna**

During early 2002, plaintiff was treated by Dr. Thomas Hanna of the Mexico

Family Health Center for back and neck pain.  (T. 161-68, 248-54).  Dr. Hanna

prescribed Naprosyn, and referred plaintiff to an orthopedic physician.

**2.  Dr. Richard Blecha - Orthopedic Surgeon**

Dr. Blecha examined plaintiff on June 11, 2003, and thereafter, treated

plaintiff during the remainder of 2003 and 2004 (T. 188-195, 236-239, repeated at 255-62).

Plaintiff's first visit to Dr. Blecha was because of "bilateral knee pain with right knee give-way." (T. 255). Plaintiff told Dr. Blecha that he was unable to do tile work because it required kneeling, and he experienced knee pain. Plaintiff also stated that although the carpal tunnel surgery had taken care of the pain and numbness, he still had some persistent numbness and significant weakness in both hands. According to plaintiff, he was unable to return to his construction work because he was unable to grasp building materials. (T. 255). Plaintiff also complained of low back pain, which had been "worsening." (T. 255).

On examination, Dr. Blecha found tenderness in plaintiff's knees, and restricted extension in plaintiff's right knee. (T. 256). The M.R.I. of plaintiff's right knee showed a tear of the anterior cruciate ligament, joint effusion, and a metallic foreign body near plaintiff's tibia. Dr. Blecha's diagnosis was torn anterior cruciate ligament in plaintiff's right knee, chondromalacia patella of both knees, bilateral carpal tunnel syndrome, and degenerative disc disease of the lumbosacral spine. (T. 256). Dr. Blecha recommended surgery for plaintiff's knee. He stated that "it does not appear that [plaintiff] can fully engage in any of the occupations that he has training for." (T. 257). Dr. Blecha also stated that "I feel at this time the patient appears to be temporarily totally disabled." *Id.*

On June 25, 2003, plaintiff told Dr. Blecha that the low back pain was radiating into his right leg, and that he had intermittent numbness in his left foot

which has existed for several years. (T. 258). Dr. Blecha found restricted movement in plaintiff's lumbar spine, with negative straight leg raising tests. Dr. Blecha stated that the x-rays showed moderate narrowing of the L5/S1 disc space, large anterior vertebral body osteophytes in the lower lumbar area, and considerable facet joint narrowing. (T. 258). Dr. Blecha's assessment was lumbar spondylosis with degenerative disc disease at L5/S1. Dr. Blecha recommended the use of Naprosyn twice a day, and stated again that plaintiff "does indeed appear to be totally disabled from any sort of activity that he has any training for." (T. 258).

On July 17, 2003, Dr. Blecha and his assistant reported that plaintiff's knee was unchanged. (T. 260). The office note also states that plaintiff was complaining about a new problem with his left shoulder. Dr. Blecha maintained the same diagnosis of lumbar spondylosis with degenerative disc disease at L5/S1, torn anterior cruciate ligament in plaintiff's right knee, and a possible left shoulder strain. Plaintiff was given a prescription for a back corset, and a "derotational brace" for plaintiff's right knee. Plaintiff returned to Dr. Blecha on July 30, 2003, and there was no change in his knee and spine problem. (T. 261). The examination revealed tenderness at the acromioclavicular joint in plaintiff's shoulder. Dr. Blecha's assessment was that plaintiff had acromioclavicular joint arthritis in his left shoulder. (T. 261).

Plaintiff saw Dr. Blecha on September 18, 2003, approximately six weeks after a steroid injection in plaintiff's left shoulder. (T. 262). Plaintiff stated that the injection helped and lasted for about four weeks. Plaintiff was using his back corset,

6

and stated that it gave him significant relief from back pain, but did not help with plaintiff's sciatic pain.  According to plaintiff, he was continuing to have knee pain, but wished to delay any knee surgery for several months.  (T. 262).  On September 29, 2003, Dr. Blecha found that plaintiff's shoulder had "nearly full range of motion", with "mild pain on abduction stress only."  (T. 236).  According to plaintiff, his shoulder was somewhat improved, but still problematic.  *Id*.

On December 4, 2003, plaintiff returned with a complaint of left shoulder pain.  Dr. Blecha found mild pain on abduction stress and palpation, but a "near full range of motion."  (T. 237).  On February 9, 2004, plaintiff told Dr. Blecha that the derotational brace was helping him, but his left shoulder had been painful since plaintiff did "a lot of shoveling two weeks ago." (T. 238).  Plaintiff also complained of cervical pain in the two to three weeks prior to the examination, but stated that the Naproxen and Darvocet had been helping his neck pain.  Dr. Blecha or his assistant found restricted flexion and extension in plaintiff's neck.  The office note states that plaintiff wished to delay his shoulder surgery "***due to legal reasons***." (T. 238) (emphasis added).  Plaintiff also stated that he wished to delay his knee reconstruction for the same reason. (T. 238).  Plaintiff was given a prescription for Flexeril in addition to the Darvocet and Naproxen. (T. 238).

On February 23, 2004, plaintiff reported that his neck pain had improved, and using the Flexeril made his neck "feel better." (T. 239).  On examination, plaintiff's neck range of motion was "much better," and plaintiff denied having any pain.  Dr. Blecha's notes show the same medical assessment, and his plan was to continue the

Darvocet with the medication Aleve. *Id.*

The record contains three forms completed for American General Insurance Company by Dr. Blecha's office, one on December 5, 2003, one on May 5, 2004, and one on June 17, 2004. (T. 240, 243, 263). These forms report on plaintiff's condition. In each form, Dr. Blecha finds that plaintiff is unable to work at his occupation, and is also unable to work "at any and all occupations." Each form states that plaintiff is totally disabled. *Id.* The December 5, 2003 form states plaintiff's conditions as impingement syndrome, left shoulder, anterior cruciate ligament tear, right knee, degenerative disc disease lumbar spine. The May 5 and June 17, 2004 forms state that plaintiff's diagnosis and condition were "unchanged." (T. 243, 263).

Dr. Blecha also completed a form dated April 5, 2004 which appears to have been sent to him by plaintiff's counsel, entitled "Work Limitations - Exertional." (T. 244). This one-page form consists of checked boxes, except for numbers inserted into the categories of how long plaintiff can sit, walk, or stand. No narrative answers were required. The form states that plaintiff had permanent restrictions, could only lift less than ten pounds, could only sit continuously for fifteen minutes, walk for five minutes, or stand for ten minutes, and that these restrictions might have been present since June 11, 2003.[1] (T. 244). On December 5, 2003, Dr. Blecha completed a form for the Oswego County Department of Social Services. (T. 241-42). Dr. Blecha stated that plaintiff could not "participate" in any full-time activities, and could not

---

[1] The court uses the term "might" because there is a question mark next to the check mark in this box. (T. 244).

work any number of hours. (T. 241-42).

### 3.  Dr. Jonathan Braiman - Board Certified Neurologist

On February 10, 2002, plaintiff was examined by Dr. Braiman, a Board-certified neurologist.  (T. 118).  Dr. Braiman found that plaintiff's neurological examination was normal in terms of the bulk, tone, and strength of all muscle groups in plaintiff's arms and hands.  Dr. Braiman found that the reflexes in plaintiff's arms were symmetrically intact, but that he had a decreased appreciation of light touch and pinprick at the tips of plaintiff's first and second fingers in both hands. (T. 118).  Dr. Braiman did nerve conduction studies, concluded that they were abnormal, and that plaintiff had mild to moderate chronic right and left sensory neuropathy at plaintiff's wrists. (T. 118-19).  Plaintiff had carpal tunnel syndrome, which was more severe in plaintiff's right hand.  Dr. Braiman recommended that plaintiff use wrist splints while driving at night, use anti-inflammatory medications, and suggested a referral for possible surgery. (T. 119).

### 4.  Dr. Jose Lopez - Independent Medical Examination

On June 17, 2002, two weeks after plaintiff's carpal tunnel surgery on his left wrist, plaintiff was examined by Dr. Lopez. (T. 128-30).  Dr. Lopez found that plaintiff had bilateral carpal tunnel syndrome, resulting in a temporary, moderate to marked, partial disability. (T. 130).  Dr. Lopez stated that plaintiff's condition was due 80% from his work, and 20% from pleasure use.  Dr. Lopez's impression was that although plaintiff had bilateral carpal tunnel syndrome, *he would be able to return to work approximately four six weeks after plaintiff's other (left) wrist*

*surgery*, providing that he completed strengthening exercises. (T. 130).  Dr. Lopez

recommended that when plaintiff returned to work, he use wrist splints, and avoid

excessive wrist flexion. (T. 130).

### 5.  Oswego Hospital - Operative Reports

The record shows operative reports from surgery by Dr. Richard Blecha during

June and July 2002.  The first operative report (T. 160) concerns carpal tunnel

surgery on plaintiff's right wrist in June 2002, and the second operative report

concerns surgery on plaintiff's left wrist during July 2002 (T. 159).

### 6.  Dr. Paul Carton - Independent Medical Examination, Board Certified Orthopedist

On December 12, 2002, Dr. Carton, a Board Certified Orthopedist, examined

plaintiff for an independent medical examination. (T. 124-27).  Dr. Carton's report

indicates that plaintiff had not had any post-operative physical therapy , and that the

plaintiff was not taking any medications at that time. (T. 124-25).  Plaintiff

complained about loss of strength in both of his hands, and intermittent pain. *Id*.  Dr.

Carton found symmetrical range of motion in both plaintiff's wrists, and found that

plaintiff was able to dorsiflex and palmar flex without restriction. (T. 125).  Phalen's

tests, and Tinel's tests were negative. (T. 125).  Dr. Carton found that plaintiff's grip

strength was good in both hands. *Id*.

Dr. Carton's opinion was that plaintiff did not need any further orthopedic

treatment or physical therapy, and that plaintiff had a temporary mild, partial

disability, such that ***plaintiff could return to full time work with restrictions on***

***heavy pulling, lifting, and pushing***. (T. 126).  Plaintiff should not lift more than

10

twenty-five pounds.  Dr. Carton found that plaintiff could sit, stand, and ambulate without restriction. (T. 126).

### 7.  Dr. August R. Buerkle - Independent Medical Examination

On July 9, 2003, plaintiff was examined by Dr. Buerkle, who found that x-rays of plaintiff's spine showed spurs at all levels and diffuse degenerative changes. (T. 197).  Dr. Buerkle believed that plaintiff would benefit from the use of a lumbosacral corset, and that he should have surgery on his right knee.  Dr. Buerkle diagnosed degenerative disc disease in plaintiff's lumbar spine and a medial meniscal tear in plaintiff's right knee. (T. 197).

### 8.  Jeanne Shapiro, Ph.D - Psychiatric Examination

On September 2, 2003, plaintiff was examined consultatively by psychologist Jeanne Shapiro. (T. 205-08).  Dr. Shapiro diagnosed alcohol abuse in early full remission. (T. 208).  She also mentioned that plaintiff had been diagnosed with numbness in his hands; back, knee, and shoulder pain; shingles; and arthritis. (T. 208).  While Dr. Shapiro did mention plaintiff's physical complaints, it is clear that her examination was restricted to any possible psychological impairments.  Dr. Shapiro found that plaintiff was able to take care of all activities of daily living, including preparing food, cleaning, doing laundry, and shopping. (T. 205-208).

### 9.  Tully Hill

The record also contains a "Clinical Evaluative Summary," from Tully Hill, a substance abuse rehabilitation facility. (T. 179-87).  Plaintiff sought voluntary admission to Tully Hill to address his alcohol problem on April 21, 2003.  In

addition to a review of plaintiff's substance abuse history, the report includes a physical examination, a "Vocational/Educational Summary," and a "Social/ Recreational Summary." (T. 182, 185-87).

The physical evaluation showed that plaintiff had bilateral decreased sensation in his hands. (T. 187). The vocational summary stated that plaintiff left work due to carpal tunnel syndrome, but also stated that plaintiff was a licensed boat captain and "takes people fishing seasonally in Oswego County." (T. 182). This section also states that plaintiff "recently" had an interview with a construction company and expected to start working after his in-patient treatment at Tully Hill. *Id.* The social and recreational summary stated that in plaintiff's spare time, he "hunts, fishes, and works in his wood shop as well as playing [sic] his guitar." (T. 182). Plaintiff stated that "hiking, fishing and hunting" were his "physical activities." *Id.*

### 10. Dr. Kalyani Ganesh - Independent Medical Exam

On September 26, 2003, plaintiff was examined orthopedically by Dr. Ganesh. (T. 210-13). Plaintiff stated that he had pain in his hands, knees, back, and shoulder, in addition to numbness in his hands and lack of strength. (T. 210). Plaintiff also stated that his right knee "gives out", and his left knee swells and aches. *Id.* Plaintiff also complained that his lower back pain continued down into his legs, and that he had pain in his shoulders when lifting or doing overhead activity. Plaintiff told Dr. Ganesh that he has a knee brace for his right knee, but was not wearing it on the date of Dr. Ganesh's examination. (T. 210).

Dr. Ganesh found that plaintiff's grip strength was 4 out of 5 bilaterally, and

that plaintiff could button buttons, zip zippers, tie a bow, and do fine motor activities. (T. 211).  She found that plaintiff had full flexion, extension, and lateral flexion in his cervical spine with no cervical or para-cervical spasm or trigger points. (T. 212).  Dr. Ganesh found that plaintiff's right shoulder was normal, but there were some slight restrictions on movement of his left shoulder. *Id.*  Dr. Ganesh found  full range motion in plaintiff's elbows, forearms, and wrists, but plaintiff had pain in his wrist during the test.  Dr. Ganesh found full flexion in plaintiff's thoracic and lumbar spine, but extension was limited by pain. (T. 212).  She also found full range of motion in plaintiff's hips, knees, and ankles, with full strength in plaintiff's proximal and distal muscles.  (T. 212).  Dr. Ganesh concluded that plaintiff had ***no limitations to sitting and standing, but had a moderate degree of limitation to walking, climbing, lifting, carrying, pushing, and pulling***.  She found that plaintiff had a moderate limitation for repetitive hand work.  (T. 212).

### 11.  Physical Residual Functional Capacity Assessment

On October 10, 2003, a non-medical consultant performed a residual functional capacity assessment.  (T. 229-34).  This assessment found that plaintiff could frequently lift ten pounds, occasionally lift twenty pounds, stand and/or walk a total of six hours, and sit for about six hours in an eight hour work day.  (T. 230).

## DISCUSSION

### 1.  <u>Disability Standard</u>

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months ...."  42

U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to basic work activities.
> If the claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment which
> meets or equals the criteria of an impairment listed in Appendix 1 of the
> regulations.  If the claimant has such an impairment, the
> [Commissioner] will consider him disabled without considering
> vocational factors such as age, education, and work experience; ... .
> Assuming the claimant does not have listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,
416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.   **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 3.  Treating Physician Rule

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 404.1527(d). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In this case, plaintiff argues that as a treating physician, Dr. Richard Blecha's

opinion should have been given controlling or substantial weight.  (Plaintiff's Brief, 9).  Plaintiff argues that the ALJ erroneously placed more weight on the opinions of Dr. Paul Carton and Dr. Kalyani Ganesh. (Plaintiff's Brief, 10).

While there is no question that Dr. Blecha was plaintiff's main treating physician, as the ALJ outlines in detail, there are many inconsistencies in the record with respect to Dr. Blecha's findings and the rest of the Administrative Record.  (T. 21-22).  The ALJ carefully, and in great detail, summarized plaintiff's testimony about his abilities, activities, restrictions, and hobbies.  (T. 21).  The ALJ carefully pointed out that there were serious inconsistencies between Dr. Blecha's opinions about plaintiff's disability and the other medical opinions in the record. (T. 22-23).

Dr. Blecha began by stating that plaintiff was disabled for the jobs for which he was trained, yet it is unclear whether Dr. Blecha knew the extent of plaintiff's "training," including the fact that he was licensed as a captain of charter boats carrying passengers for fishing tours, and that plaintiff had been working installing rigging and electronics on boats.  Dr. Blecha's later opinions are extremely restrictive, and he finds in essence that plaintiff is ***unable to do anything,*** putting extremely severe restrictions on any type of sitting, standing, or walking.  These restrictions are ***clearly inconsistent with plaintiff's own statements*** to the medical personnel at Tully Hill, and plaintiff's statements to independent medical examiners, Drs. Carton and Ganesh.  On July 16, 2003, plaintiff stated, through a representative, that plaintiff could walk "indefinitely, if he paces himself." (T. 98).

The record contains substantial evidence to support the ALJ's decision that

17

plaintiff is capable of doing light work.  This conclusion is supported by the findings

of Dr. Braiman who, during February 2002, found that plaintiff had mild to moderate

restrictions, however, this opinion was rendered prior to the carpal tunnel surgery in

June and July of 2002. (T. 159, 160).  Although plaintiff argues that his carpal tunnel

surgery was unsuccessful, this is clearly not the case, and the record does not support

that argument.

Dr. Carton, a board certified orthopedist, found that plaintiff had a

"*temporary, mild, partial disability*" *and can return to full-time work with the*

*restriction of no lifting greater than twenty-five pounds*. (T. 126).  Dr. Carton also

placed *no restrictions on plaintiff's ability to sit, stand, and walk*.  Dr. Jose Lopez,

another examining physician, found that plaintiff had a temporary moderate to

marked *partial* disability, *and also found that plaintiff could return to work*

*approximately six weeks after his second carpal tunnel surgery*.  (T. 130).

Dr. Ganesh also did *not place any limitations on plaintiff's ability to sit or*

*stand*, but did place moderate limitations on plaintiff's walking or climbing, and

moderate limitations on any repetitive hand work.  The ALJ's finding that Dr.

Blecha's opinions are not supported by his own treating records is fully supported by

substantial evidence in the record.  The ALJ points out that on June 25, 2003, Dr.

Blecha stated that x-rays of plaintiff's lumbosacral spine showed moderate

narrowing of the L/5-S/1 disc space, large anterior vertebral body osteophytes in the

lower half of the lumbar spine, and "considerable facet joint narrowing" in the lower

half of the lumber spine bilaterally. (T. 22). *See* (T. 258).  However, the actual x-ray

report, dated June 23, 2003 states that five views of the lumbar spine show "normal vertebral body height," the disc space between L/5 and S/1 was "mildly narrowed," and the "facet joints are unremarkable." (T. 196).  This x-ray report states that the x-rays were requested by Dr. Blecha. *Id.*  Clearly, Dr. Blecha read the x-ray report differently than the physician who gave his "impression" of the x-ray.

The ALJ also clearly relies upon the opinions of Dr. Carton and Dr. Ganesh as substantial evidence contradicting Dr. Blecha's findings.  In addition, the opinions of Dr. Lopez and the examination by Jeanne Shapiro (T. 205-08), plus the records of plaintiff's treatments at Tully Hill further support the ALJ's conclusions and further contradict Dr. Blecha's opinions.  In a statement completed by plaintiff's representative, and submitted to New York State on July 16, 2003, plaintiff stated that if he paces himself, he can walk "indefinitely." (T. 98).  This statement is directly contrary to Dr. Blecha's opinions about plaintiff's ability to walk.

The court also notes that the "treating physician rule" does ***not*** apply to opinions regarding residual functional capacity or to opinions of "ultimate disability," which are issues reserved to the Commissioner. *Taylor v. Astrue*, CV-07-3469, 2008 U.S. Dist. LEXIS 46619, *7-8 (E.D.N.Y. June 17, 2008)(citing 20 C.F.R. § 404.1527(e)).  Since the Dr. Blecha's opinion was inconsistent with other substantial evidence of record, the ALJ's decision to place less weight upon the treating physician's opinion is supported by substantial evidence.

## 4.  Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the

objective medical evidence in the record, the claimant's demeanor, and other indicia

of credibility, but must set forth his or her reasons 'with sufficient specificity to

enable us to decide whether the determination is supported by substantial evidence.'"

*Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*,

No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy

the substantial evidence rule, the ALJ's credibility assessment must be based on a

two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see*

*also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March

3, 1998).

 First, the ALJ must determine, based upon the claimant's objective medical

evidence, whether the medical impairments "could reasonably be expected to

produce the pain or other symptoms alleged...."  20 C.F.R. § 404.1529(a).  Second, if

the medical evidence alone establishes the existence of such impairments, then the

ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's

symptoms to determine the extent to which it limits the claimant's capacity to work.

*Id.* § 404.1529(c).

 When the objective evidence alone does not substantiate the intensity,

persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the

credibility of the claimant's subjective complaints by considering the record in light

of the following symptom-related factors: (1) claimant's daily activities; (2) location,

duration, frequency, and intensity of claimant's symptoms; (3) precipitating and

aggravating factors; (4) type, dosage, effectiveness, and side effects of any

medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

In this case, the ALJ found that plaintiff was "generally credible," but that his statements did not rise to the level of disability under the Social Security law and regulations. (T. 22). The ALJ then carefully reviewed plaintiff's statements regarding his activities, the medical evidence, and the methods plaintiff used for relieving the pain. (T. 22). The record shows that plaintiff was inconsistent in his statements regarding his daily activities.

For example, in his hearing testimony, plaintiff stated that he was only required to shovel three steps to his small cottage. (T. 284). On February 9, 2004, plaintiff reported to Dr. Blecha that his shoulder was painful because he was "doing a lot of [snow] shoveling two weeks ago." (T. 238). In a form submitted to the New York State Division of Disability Determinations, plaintiff stated that he uses a riding lawn mower rather than a push mower. During his testimony, plaintiff stated that he could use a push mower. (T. 282). As the ALJ pointed out, plaintiff continued to go fishing and hunting. (T. 22).

The record shows the plaintiff was delaying surgery on his knee for "***legal reasons***." (T. 238). Although plaintiff testified that he has difficulty with "dropping things because of reduced grip strength in his hands," he clearly testified that he continued to hunt. His explanation of how he shot deer while he sat at the kitchen

21

table, standing up only to open the door and shoot outside is unusual and

questionable. (T. 286).  The record also contains statements by plaintiff during his

stay at Tully Hill during April *2003*, that he "*. . . recently had an interview with*

*CDM Engineering as a construction worker, and he expects to go to work for them*

*when he completes in-patient treatment*." (T. 182).  Clearly during April 2003,

plaintiff intended to return to work.  He also stated to the examiners at Tully Hill that

he continued to work in his wood shop, and play his guitar, in addition to hiking,

fishing, and hunting as his physical activities. (T. 182). Clearly, these activities are

outdoor activities on uneven ground, and can easily be classified as vigorous.

Accordingly, the ALJ's finding about plaintiff's credibility is fully supported by

substantial evidence in the record.

## 5.  Residual Functional Capacity

In rendering a residual functional capacity (RFC) determination, the ALJ must

consider objective medical facts, diagnoses and medical opinions based on such

facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of

other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp.

2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y.

1990)).  An ALJ must specify the functions plaintiff is capable of performing, and

may not simply make conclusory statements regarding a plaintiff's capacities.

*Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*,

737 F. Supp. at 183.

The ALJ in this case found that plaintiff could return to one of his prior light

work occupations, however, the ALJ also used a Vocational Expert (VE) to find that plaintiff could perform other substantial work in the national economy. (T. 23, 293-97). Plaintiff argues that the ALJ's finding that he can perform his past light work is not supported by substantial evidence in the record. (Plaintiff's Brief, 12).

Plaintiff reads the regulations for light work as including a great deal of walking. The regulations state that work is "light" when it involves lifting no more than 20 pounds at a time with frequent lifting of up to 10 pounds. 20 C.F.R. § 404.1567(b). Work is also considered "light" when it requires a good deal of walking or **standing**, even if the weight lifted is very little. *Id.* Finally, light work includes jobs that involve sitting most of the time with some pushing or pulling of arm or leg controls. *Id.*

Other than Dr. Blecha, ***none*** of the other examining physicians, some of whom are board-certified, placed any restrictions on plaintiff's ability to stand and perform light work. Dr. Carton found that plaintiff could return to full time work with avoidance of heavy lifting (T. 126), and Dr. Ganesh placed no restrictions on standing or sitting.(T. 212). Dr. Lopez also found that plaintiff could return to work approximately six months after plaintiff's second carpal tunnel surgery, which occurred in July 2002. It is the responsibility of the ALJ, not the court, to weigh conflicting evidence. *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). As stated above, the ALJ's decision to reject Dr. Blecha's opinion is supported by substantial evidence, thus, the ALJ's RFC is also supported by substantial evidence.

The court would also point out that although the ALJ found that plaintiff could

perform one of his prior light work jobs, and thus stopped at step four of the five step disability analysis, the ALJ also used the services of a VE to determine that plaintiff could also perform "other" light work occupations. (T. 23-24).  Based upon the entire medical record, and all of the medical opinions, the ALJ's finding regarding plaintiff's Residual Functional Capacity is supported by substantial evidence in the record.

   **WHEREFORE,** based on the findings in the above Report, it is hereby

   **RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED** and the Complaint (Dkt. No. 1) be **DISMISSED.**

   Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: June 23, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge